FILED
2019 May-29  PM 04:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| JAMES HENDERSON, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CAROL HENDERSON, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 5:19-cv-00436 |
| | ) | |
| vs. | ) | |
| | ) | |
| MARK MCMURRAY, | ) | **AMENDED COMPLAINT** |
| | ) | |
| and | ) | |
| | ) | |
| CITY OF HUNTSVILLE, ALABAMA | ) | |
| | ) | |
| Defendants. | ) | |

COME NOW the Plaintiffs, James and Carol Henderson, (the Hendersons) and file their complaint against Mark McMurray and the City of Huntsville ("the defendants") and allege the following:

### INTRODUCTION

1. This action arises out of an unconstitutional restriction on a special events permit.

2. The Hendersons seek to have this restriction enjoined as unconstitutional and to be compensated for the deprivation of their constitutional rights.

### PARTIES AND JURISDICTION

3. The Hendersons, husband and wife, reside in Morgan County, Alabama.

4. Defendant Mark McMurray is the Chief of the City of Huntsville Police Department, located in Madison County, Alabama.

5. Defendant City of Huntsville is located in Madison County, Alabama

6. The Hendersons seek redress for federal constitutional violations pursuant to 42 U.S.C. § 1983. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1243(3).

7. This Court has supplemental jurisdiction to grant relief on state-law claims pursuant to 28 U.S.C. § 1367.

## FACTUAL HISTORY

8. The Hendersons believe that abortion is the murder of an unborn child and is contrary to their sincerely held religious beliefs.

9. Acting upon those beliefs, the Hendersons are long-time abortion counselors and pro-life advocates with a regular and peaceful presence outside of Huntsville abortion clinics located at 4831 Sparkman Dr. NW, and 610-614 Madison Street.

10. When they are at either location, they typically stand on the public sidewalk near the clinic and audibly express their views, pray, and counsel to the employees, visitors, and patients who pass by.

11. The Hendersons' typical activity constitutes a "minor event", not requiring a permit, under the following provisions of the Huntsville code:

**Sec. 23-201. - Purpose; definitions.**

(b) Definitions. The following words, terms and phrases, when used in this article, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning:

[ ]

Minor event means an organized event which:

1. Will be conducted at a time and place and in a manner that complies with applicable laws, including section 23-232 of this article;

2. Does not require or include for the conduct of the event the use of an enhancement;

3. Does not require approval, licensing, or permitting pursuant to other city laws, including the city's alcoholic beverage laws, technical and fire codes, and business license code, and laws administered by the health department;

4. Does not require city event services including the standard complement;

5. In the case of an organized event conducted on a street, does not have more than 25 vehicles at any one time during the conduct of the event;

6. In the case of an organized event conducted in a park, does not have more than 300 participants at any one time during the conduct of the event, subject to applicable capacity limits for the public space;

7. In the case of an organized event conducted on a sidewalk, does not have participants at any one time during the conduct of the event whose number exceeds 50 participants in the case of an assembly and 100 participants in the case of a procession, subject to applicable capacity limits for the public space;

8. Is not a sound event; and

9. Is not a for-profit event.

[ ]

**Sec. 23-231. - Requirement; event cancellation; lease events; sound events; extended events.**

a.  Permit requirement . Except for minor events, all organized events conducted on a public area shall be required to obtain a special event permit. No person shall knowingly participate in a special event for which an event permit is required under this article unless an event permit has been issued for the event.

3

12. The Hendersons and similar pro-life advocates are not the only ones to congregate outside the clinic. Pro-choice advocates also counter the pro-life advocates in expressing their views.

13. The defendants have adopted a policy allowing a group to obtain a permit for traditionally protected speech on the public sidewalk and thereby exclude other groups from the same sidewalk. This unconstitutionally applies Huntsville Code section 23-203(19), which provides:

> **Sec. 23-203. - General conditions.**
>
> Organized events. All organized events, including special events, regulated by this article shall be subject to the following conditions:
>
> [ ]
>
> (19) Where there is more than one organized event conducted upon a sidewalk in the same general area, the events shall be conducted generally at least ten feet apart, unless the special event permit allows otherwise.

This has had the effect of forcing the Hendersons to the opposite side of the busy streets in front of the clinics, seriously hampering their efforts to reach women.

14. The pro-choice advocates not only employ the permit process to exclude the Hendersons from the sidewalk, but employ loud shouting and even the ringing of cowbells to drown out their message. The defendants fail to protect the Hendersons from this thuggery despite its violation of the following Huntsville Code section:

> Sec. 23-204. - Public conduct.
>
> a. No person, including participants in another organized event, shall unreasonably hamper, obstruct, impede, or interfere with an organized event or with any person, vehicle, or animal participating or used in the event.

15. In order to address these conditions, the Hendersons employ raised voices and sometimes amplification to make their message discernible. Though they shouldn't need a permit to express their message, the amplification arguably makes the activity a "sound event" requiring a permit under the following provisions of the Huntsville Code:

**Sec. 23-201. - Purpose; definitions.**

b. Definitions . The following words, terms and phrases, when used in this article, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning:

[ ]

Organized event means an assembly or procession, or a combination thereof.

[ ]

Sound event means an organized event which involves the use of amplified sound or the production of noise which would violate the city's noise ordinance found in chapter 12, article V of this Code.

**Sec. 23-231. - Requirement; event cancellation; lease events; sound events; extended events.**

a. Permit requirement . Except for minor events, all organized events conducted on a public area shall be required to obtain a special event permit. No person shall knowingly participate in a special event for which an event permit is required under this article unless an event permit has been issued for the event.

16. Accordingly, the Hendersons obtained a special-events permit at the direction of the Huntsville Police Department. The Hendersons renew this permit every six months and have done so for several years.

17. Initially, the Hendersons' use of amplified sound was limited to 62 decibels in accord with the following provision of the Huntsville noise ordinance:

**Sec. 12-265. - Sound levels by receiving land use.**

No person shall operate, cause to be operated or generate any source of sound in such a manner as to create a sound level which exceeds the following limits when measured at or within the property line of the receiving land use:

Sound Levels by Receiving Land Use

| Receiving Land Use Category | Time | Sound Level Limit dB(A) |
|---|---|---|
| Residential, public space open space, agricultural, institutional property | 7:00 a.m.—10:00 p.m. | 55 |
| | 10:00 p.m.—7:00 a.m. | 50 |
| Commercial or business | At all times | 62 |
| Industrial | At all times | 70 |

This restriction was easily measured by law enforcement officers or the Hendersons themselves, and the Hendersons readily complied with it.

18. In 2017, the City of Huntsville added language to the permit which states that "[t]he amplified sound produced by a participant in the event shall not be plainly audible inside adjacent or nearby buildings. The amplified sound is plainly audible if the amplified sound can be clearly heard inside an adjacent or nearby building by a person using his normal hearing faculties, provided that the person's hearing is not enhanced by any mechanical device, such as a microphone or hearing aid. As long as the amplified sound is plainly audible by a person inside the building

using normal hearing faculties, the particular words or phrases being produced need not be determined."

Copies of the most recent permits are attached as Exhibits A and B. They are signed by Defendant Mark McMurray in his capacity as police chief.

19. The new permit provisions are in conflict with the following provision of the Huntsville noise ordinance:

> **Sec. 12-231. - Definitions.**
>
> The following words, terms and phrases, when used in this article, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning:
>
> [ ]
>
> Audible sound means any sound for which the information content of that sound is transferred to the listener, such as but not limited to understanding of spoken speech, comprehension of whether a voice is raised or normal, or comprehension of musical rhythms.

20. In addition, unlike the easily applied decibel standard, the new permit provisions not only fail to provide for any objective means by which the speaker can assess his compliance with the ordinance, but place the merely subjective means only in the hands of hearers who are overtly hostile to the Hendersons' message. This overbreadth and vagueness are unconstitutional. They render the permit requirement arbitrary and capricious.

21. The new permit provisions are also in violation of the purposes of the Huntsville events code set forth as follows:

**Sec. 23-201. - Purpose; definitions.**

a. Purpose. In order to preserve and protect the rights guaranteed under the First Amendment of the United States and Alabama Constitutions and to provide for the safe and orderly use of public property, for both First Amendment activity and activity that is not protected by the First Amendment, this article is intended to establish **reasonable** time, place, and manner regulations for the use of public property characterized as traditional public forums. The regulations are designed to be content-neutral, **narrowly tailored** to serve significant governmental interests, and to leave open ample alternative channels for communications of information. The regulations are also intended to coordinate multiple uses of limited space; assure preservation of public facilities and improvements; prevent dangerous, unlawful, or impermissible uses of public property; protect the public safety; ensure that city resources are deployed efficiently and effectively; provide for fees and cost recovery; address secondary harms; and authorize **and establish objective standards** in the administration of this article.

(emphasis supplied)

22. Furthermore, the new permit provisions deprive the Hendersons of the specificity contemplated in the following provisions of the Huntsville code:

**Sec. 23-231. - Requirement; event cancellation; lease events; sound events; extended events.**

**(d)**
**Sound events** .
(1)
Sound events are subject to the approval of the city's department of natural resources and event organizers shall be required to complete an application on forms provided by the city. The application will be processed by the department of natural resources in conjunction with the processing of the special permit application by the event administrator.
(2)
In approving sound events the department of natural resources may consider, among other relevant considerations, the proposed time, location, and duration of the event; secondary harms; whether there is a more suitable alternative location or time for the

8

event; the affect the sound levels would have on the ability of the city to conduct crowd control; the likely hardship on the successful conduct of the event if the sound event is not approved; the history of citizens' noise complaints for the same or substantially similar events or locations; and the decibel level likely to be generated by the event.
(3)
In approving a sound event the department of natural resources may attach reasonable conditions which address the impact of the sound event, such as limiting the duration or time of the event, moving the event to a more suitable location or time, setting acceptable decibel levels for the event, and dictating the positioning and direction of the amplification equipment.

(emphasis supplied)

23. The Hendersons, individually and through counsel, have made multiple and concerted efforts to persuade the City of Huntsville that the new permit provisions are unconstitutional and should be removed from the permit. These objections have been disregarded by the defendants.

24. On or about September 2018, when the Hendersons attempted to file their new application, they signed the application with a caveat saying "subject to the US and Alabama Constitution and advice of counsel."

25. The Hendersons and their counsel were informed by the City of Huntsville attorney their application would not be granted with the condition they had added. Having no choice but to either accede to the new provision or face prosecution for protected expression, the Hendersons signed off on the new language and have since then been unconstitutionally restricted in the expression of their message.

26. Copies of the Huntsville Municipal Code Chapter 12 (on noise) and Chapter 23 (on events) are marked exhibits C and D respectively and attached.

## STATE ACTION AND CITY POLICY

27. Defendant Mark McMurray added the new permit provisions in his capacity as Huntsville police chief. Objections to it were overruled by defendant McMurray and by the Huntsville city attorneys.  These actions of the municipality constitute state action and reflect a policy adopted by the City of Huntsville.

## FEDERAL CLAIMS

### Count I

### First Amendment: Freedom of Speech

28. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint, as if fully set forth in this Count.

29. The First Amendment's Freedom of Speech Clause, incorporated and made applicable to state and local governments by the Fourteenth Amendment to the United States Constitution, prohibits abridging the freedom of speech.

30. A requirement of a permit under the circumstances, and an arbitrary permit provision like the one used here restrict the Henderson's right to free speech.

31. The permit's requirements are not content neutral and are not reasonable.

32. The permit's requirements do not leave ample alternative channels of accomplishing the communication.

33. The permit's requirements do not serve a compelling state interest and are not narrowly tailored.

34. The Defendants have therefore violated the Hendersons' right to freedom of speech.

## Count II

## First Amendment: Free Exercise of Religion

35. The Hendersons reallege and incorporate by reference all preceding paragraphs of this Complaint, as if fully set forth in this Count.

36. The First Amendment's Free Exercise of Religion Clause, incorporated and made applicable to state and local governmental action by the Fourteenth Amendment to the United States Constitution, prohibits burdening the free exercise of religion.

37. The Hendersons have a sincere religious belief that abortion is the wrongful killing of an unborn child. They manifest and otherwise practice that religious belief by, *inter alia*, peacefully praying and counseling outside the Alabama Women's Center in Huntsville, Alabama, engaging in sidewalk counseling, otherwise communicating that religious belief to people going into or exiting that property, and fellowshipping with like-minded religious believers who are also peacefully praying and counseling outside the property.

38. Defendants knowingly or intentionally violated the Hendersons' right to the free exercise of their religion.

39. By enforcing the ordinance and imposing an arbitrary and restrictive provision on the Hendersons' permits, Defendants are restricting the Hendersons' right to the free exercise of their religion. If they are unable to speak what they believe and

counsel people in accord with their beliefs, they will not be able to exercise their religion.

40. Because the Defendants' actions violate both the Free Speech and Free Exercise Clause, the Free Exercise claim is entitled to strict-scrutiny review under the hybrid-rights doctrine of *Employment Division v. Smith*, 494 U.S. 872 (1990).

41. Thus, the Defendants have violated the Hendersons' right to Free Exercise of Religion.

PRAYER FOR RELIEF

Wherefore, the Hendersons pray for judgment against the defendants, jointly and severally:

a. Enjoining the defendants from requiring permits for the Hendersons' constitutionally protected use of the public sidewalk and imposing improper requirements on those permits;

b. Awarding the Hendersons general and special damages as provided by law;

c. Awarding the Hendersons reasonable attorney fees and expert witness fees pursuant to 42 U.S.C. § 1988, and as otherwise provided by law;

d. Award such other and further relief as the Court deems proper and just.

Respectfully submitted this 29th day of May, 2019.




    _/s/ Samuel J. McLure_____

Samuel J. McLure (MCL-056)
*Attorney for the The Hendersons*
PO Box 640667
Pike Road, AL 36104
334-546-2009
sam@mclurelaw.com


 _/s/ Matthew J. Clark_____
Matthew J. Clark
*Attorney for the The Hendersons*
PO Box 179
Montgomery, AL 36101
256-510-1828
mclark@clarklawgroup.org

# EXHIBIT A



ORGANIZED EVENT PERMIT
EVENT TYPE: MINOR ■ BASIC □ ADVANCED □

HUNTSVILLE

| Name of Event: Pro-Life Christian Counseling and Prayer | Purpose: Pro-Life Counseling and Prayer |
|---|---|
| Event Organizer: James Henderson | Contact Information:<br>181 Henderson Road   Decatur, AL  35603<br>Home: (256) 350-6067<br>Cell: (256) 337-0826<br>emmanueljrh@bellsouth.net |
| Location: This event will be held on the public sidewalk on both sides of Sparkman Drive adjacent to 4831 and 4833 Sparkman Drive, or at such other route or place orally directed by a duly authorized officer of the Huntsville Police Department for cause. | Number of Anticipated Participants:<br>Up to 135 participants approved (North side of street only)<br>Up to 147 participants approved (South side of street only) |
| | Dates & Times:<br>Begin date: March 28, 2019<br>End date: September 28, 2019<br>Begin time: 8:00 AM<br>End time: 6:00 PM |

## THE EVENT ORGANIZER MUST HAVE A COPY OF THIS PERMIT WITH THEM AT ALL TIMES DURING THE CONDUCT OF THIS EVENT

**Conditions:**

1. The conduct of the event and event participants shall comply with the Code of Ordinances of the City of Huntsville, Alabama, Chapter 23, Article VI ("Organized Events Ordinance").

2. Additional conditions are as follows:

(i) This reservation is issued with the understanding and with the express condition that the demonstration will conform to all applicable provisions of the Special Events Ordinance.

(ii) The Reservee shall carry this Demonstration Reservation Permit upon his or her person during the conduct of the public demonstration/protest and shall produce this Demonstration Reservation Permit upon the demand by the Chief of Police of the City of Huntsville, Alabama, or by any other duly authorized person in his behalf.

(iii) This Reservation replaces all other Reservations presently in effect in all matters and forms.

(iv) Participants shall observe the capacity numbers established for such events (nine square feet per person) and participants shall use that public space allocated for this event.

(v) A duly authorized officer of the Huntsville Police Department may terminate or temporarily suspend this event for cause when existing or imminent conditions pose an immediate danger to the safety, health or life of bystanders, spectators, participants, the general public and/or public employees involved in or working the event. These conditions may include, but are not limited to, extreme weather conditions (any condition or event that does, or may, pose a threat to the safety or life of any person or damage to property), manmade or natural disasters, lack of sufficient personnel to maintain normal Police or other emergency functions or conduct the event in a safe manner, a breach of the peace is occurring, or such other basis provided for in the city ordinance. This decision will be made after consultation with the event sponsor(s), if time and conditions permit. All persons will be asked to leave the area and seek shelter if threatening weather conditions exist that deem it necessary to suspend or terminate the event. If the event is suspended it will resume, if possible, as soon as the threatening conditions clear and it is safe to do so.

(vi) The use of amplified sound for the event is approved, conditioned as follows: The amplified sound produced by a participant in the event shall not be plainly audible inside adjacent or nearby buildings. The amplified sound is plainly audible if the amplified sound can be clearly heard inside an adjacent or nearby building by a person using his normal hearing faculties, provided that the person's hearing is not enhanced by any mechanical device, such as a microphone or hearing aid. As long as the amplified sound is plainly



ORGANIZED EVENT PERMIT
EVENT TYPE: MINOR ■ BASIC □  ADVANCED □

HUNTSVILLE

| Name of Event: Pro-Life Christian Counseling and Prayer | Purpose: Pro-Life Counseling and Prayer |
|---|---|
| Event Organizer: James Henderson | Contact Information:<br>181 Henderson Road    Decatur, AL  35603<br>Home: (256) 350-6067<br>Cell: (256) 337-0826<br>emmanuelirh@bellsouth.net |
| Location: This event will be held on the public sidewalk on both sides of Sparkman Drive adjacent to 4831 and 4833 Sparkman Drive, or at such other route or place orally directed by a duly authorized officer of the Huntsville Police Department for cause. | Number of Anticipated Participants:<br>Up to 135 participants approved (North side of street only)<br>Up to 147 participants approved (South side of street only) |
|  | Dates & Times:<br>Begin date: March 28, 2019<br>End date: September 28, 2019<br>Begin time: 8:00 AM<br>End time: 6:00 PM |

## THE EVENT ORGANIZER MUST HAVE A COPY OF THIS PERMIT WITH THEM AT ALL TIMES DURING THE CONDUCT OF THIS EVENT

**Conditions:**

1. The conduct of the event and event participants shall comply with the Code of Ordinances of the City of Huntsville, Alabama, Chapter 23, Article VI ("Organized Events Ordinance").

2. Additional conditions are as follows:

(i) This reservation is issued with the understanding and with the express condition that the demonstration will conform to all applicable provisions of the Special Events Ordinance.

(ii) The Reservee shall carry this Demonstration Reservation Permit upon his or her person during the conduct of the public demonstration/protest and shall produce this Demonstration Reservation Permit upon the demand by the Chief of Police of the City of Huntsville, Alabama, or by any other duly authorized person in his behalf.

(iii) This Reservation replaces all other Reservations presently in effect in all matters and forms.

(iv) Participants shall observe the capacity numbers established for such events (nine square feet per person) and participants shall use that public space allocated for this event.

(v) A duly authorized officer of the Huntsville Police Department may terminate or temporarily suspend this event for cause when existing or imminent conditions pose an immediate danger to the safety, health or life of bystanders, spectators, participants, the general public and/or public employees involved in or working the event. These conditions may include, but are not limited to, extreme weather conditions (any condition or event that does, or may, pose a threat to the safety or life of any person or damage to property), manmade or natural disasters, lack of sufficient personnel to maintain normal Police or other emergency functions or conduct the event in a safe manner, a breach of the peace is occurring, or such other basis provided for in the city ordinance. This decision will be made after consultation with the event sponsor(s), if time and conditions permit. All persons will be asked to leave the area and seek shelter if threatening weather conditions exist that deem it necessary to suspend or terminate the event. If the event is suspended it will resume, if possible, as soon as the threatening conditions clear and it is safe to do so.

(vi) The use of amplified sound for the event is approved, conditioned as follows: The amplified sound produced by a participant in the event shall not be plainly audible inside adjacent or nearby buildings. The amplified sound is plainly audible if the amplified sound can be clearly heard inside an adjacent or nearby building by a person using his normal hearing faculties, provided that the person's hearing is not enhanced by any mechanical device, such as a microphone or hearing aid. As long as the amplified sound is plainly



# EXHIBIT B



ORGANIZED EVENT PERMIT
EVENT TYPE: MINOR ■ BASIC □ ENHANCED □

| Name of Event: Pro-Life Christian Counseling and Prayer | Purpose: Pro-Life Counseling and Prayer |
|---|---|
| Event Organizer: James Henderson | Contact Information:<br>181 Henderson Road   Decatur, AL  35603<br>Home: (256) 350-6067<br>Cell: (256) 337-0826<br>emmanueljrh@bellsouth.net |
| Location: The public sidewalk in front of 610, 612 and 614 Madison Street, or at such other route or place orally directed by a duly authorized officer of the Huntsville Police Department for cause. | Number of Anticipated Participants:<br>Up to 16 participants approved (West side of street only)<br>Up to 36 participants approved (East side of street only) |
| | Dates & Times:<br>Begin date: March 30, 2019<br>End date: September 30, 2019<br>Begin time: 8:00 AM<br>End time: 6:00 PM |

## THE EVENT ORGANIZER MUST HAVE A COPY OF THIS PERMIT WITH THEM AT ALL TIMES DURING THE CONDUCT OF THIS EVENT

Conditions:
1. The conduct of the event and event participants shall comply with the Code of Ordinances of the City of Huntsville, Alabama, Chapter 23, Article VI ("Organized Events Ordinance").
2. Additional conditions are as follows:
(i) This reservation is issued with the understanding and with the express condition that the demonstration will conform to all applicable provisions of the Special Events Ordinance.
(ii) The Reserve shall carry this Demonstration Reservation Permit upon his or her person during the conduct of the public demonstration/protest and shall produce this Demonstration Reservation Permit upon the demand by the Chief of Police of the City of Huntsville, Alabama, or by any other duly authorized person in his behalf.
(iii) This Reservation replaces all other Reservations presently in effect in all matters and forms.
(iv) Participants shall observe the capacity numbers established for such events (nine square feet per person) and participants shall use that public space allocated for this event.
(v) A duly authorized officer of the Huntsville Police Department may terminate or temporarily suspend this event for cause when existing or imminent conditions pose an immediate danger to the safety, health or life of bystanders, spectators, participants, the general public and/or public employees involved in or working the event. These conditions may include, but are not limited to, extreme weather conditions (any manmade or natural disasters, lack of sufficient personnel to maintain normal Police or other emergency functions or conduct the event in a safe manner, a breach of the peace is occurring, or such other basis provided for in the city ordinance. This decision will be made after consultation with the event sponsor(s), if time and conditions permit. All persons will be asked to leave the area and seek shelter if threatening weather conditions exist that deem it necessary to suspend or terminate the event. If the event is suspended it will resume, if possible, as soon as the threatening conditions clear and it is safe to do so.
(vi) The use of amplified sound for the event is approved, conditioned as follows: The amplified sound produced by a participant in the event shall not be plainly audible inside adjacent or nearby buildings. The amplified sound is plainly audible if the amplified sound can be clearly heard inside an adjacent or nearby building by a person using his normal hearing faculties, provided that the person's hearing is not enhanced by any mechanical device, such as a microphone or hearing aid. As long as the amplified sound is plainly

audible by a person inside the building using normal hearing faculties, the particular words or phrases being produced need not be determined.

(vii) Existing handicap access must be maintained, unless alternate access is provided that is clearly marked and meets all applicable federal, state and city laws, statutes, ordinances and rules and regulations. All such structures shall meet the Americans with Disabilities Act (ADA) standards for accessibility.

(viii) Participants shall not obstruct vehicles entering from or exiting onto the public streets, and shall allow a sufficient line-of-sight for all vehicles entering from or exiting onto the public streets and, to that end, shall not assemble or place objects within clear zones established by HPD.

(ix) Participants will not harass, annoy nor alarm participants in counter or other demonstrations.

(x) The listed location(s) has been checked and sufficient illumination by artificial lighting is present as of September 24, 2018.  Any changes in the present lighting at any of the locations may render the affected location(s) unusable due to insufficient lighting after sunset until sunrise.

(xi) All applicable federal and state laws and municipal ordinances must be adhered to in the conduct of this event.

Issuance: Under the authority conferred upon the undersigned by virtue of the Organized Events Ordinance and under the terms set forth herein the above-stated sponsor is hereby authorized to conduct the above-stated event on or through the public property described herein.

ISSUED this _28th_ day of _March_ , 2019. _Mark A. McMurray_
                                                                    Chief of Police

This Permit replaces all other permits that may be presently in effect, issued to the same sponsor/applicant for the same event.

Acceptance:  The undersigned hereby accepts this Permit and agrees to abide by its terms and conditions. The Sponsor/Applicant shall carry this permit upon his or her person during the conduct of the special event, parade, procession, or public demonstration and shall produce this permit upon the demand by the Chief of Police of the City of Huntsville, Alabama, or by any other duly authorized person on his behalf.

ACCEPTED this _15_ day of _April_ , 2019. _Jackie Henderson_
                                                                    Event Organizer

Event Number: 2569, Pro-Life Christian Counseling and Prayer/MM



# EXHIBIT C

- **ARTICLE V. - NOISE[6]**


- **DIVISION 1. - GENERALLY**


- **Sec. 12-231. - Definitions.**

    The following words, terms and phrases, when used in this article, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning:

    *A-weighted sound level* means the sound pressure level as measured with the sound level meter using the A weighing network. The standard unit notation is dB(A).

    *Ambient noise* means background noise.

    *Audible sound* means any sound for which the information content of that sound is transferred to the listener, such as but not limited to **understanding of spoken speech**, comprehension of whether a voice is raised or normal, or comprehension of musical rhythms.

    *Commercial premises* means any premises where offices, clinics, kennels, shopping and service establishments exist.

    *Construction* means any and all activity incidental to the erection, demolition, assembling, altering, installing or equipping of buildings, structures, roads or appurtenances, including land clearing, grading, excavating and filling.

    *Construction equipment* means any equipment or devices, such as but not limited to pile drivers, power shovels, derricks, hoist tractors, loaders, rollers, concrete hauling motor vehicles, pavement breakers, bulldozers, crawler-tractors, rotary drills and augers, cranes, ditchers, trenchers, scrapers, wagons, pumps, compressors and pneumatic power equipment, or other mechanical apparatus operated by fuel or electric power in the construction, repair or demolition of any building, structure, land, street, alley, waterways or appurtenances.

    *dB(A)* means the composite abbreviation for A-weighted sound level in decibels.

    *Decibel* means a logarithmic unit of measure of 10 used in measuring magnitudes of sound. The symbol is dB.

    *Domestic power equipment* means any equipment or device rated at 15 horsepower or less and used for home or building repairs and grounds maintenance.

    *Emergency work* means any activities performed for the purpose of preventing or alleviating physical trauma or property damage threatened or caused by an existing or imminent peril.

*Hard test site* means any test site having the ground surface covered with concrete, asphalt, packed dirt, gravel or similar reflective material for more than half the distance between the microphone target point and the microphone location point.

*Highways* means the streets, alleys and highways within the city limits.

*Industrial premises* means any premises where manufacturing, processing or fabrication of goods or products takes place. For purposes of this article, all railroad rights-of-way are considered to be industrial premises.

*Land use category* means the actual existing utilization of the land regardless of its designation by the city zoning board.

*Microphone line* means the unmarked reference line running parallel to the vehicle path and passing through the microphone.

*Microphone target point* means the unmarked location on the center of the lane of travel that is closest to the microphone.

*Motor vehicle* means any self-propelled vehicle.

*Motorcycle* means any motor vehicle having a seat or saddle for the use of the rider and designed to travel on not more than three wheels, but excluding a tractor.

*Motor-driven cycle* means every motorcycle and every motor scooter with a motor which does not exceed five brake horsepower, including every bicycle with a motor attached.

*Muffler* means an apparatus consisting of a series of chambers or baffle plates designed for the purpose of transmitting gases while reducing sound emanating from such apparatus.

*Noise* means any sound which annoys or disturbs humans **or** which causes or tends to cause an adverse psychological or physiological effect on humans.

*Noise control officer* means the director of the air pollution control office of the city.

*Premises of public access* means the outdoor portion of a privately owned parcel of real property which is readily accessible to the general public and onto which the general public is or has been invited to enter on a continuous or recurrent basis. Examples include, but are not limited to, parking areas, gasoline dispensing facilities, and outdoor shopping and dining establishments. For purposes of this definition, roofed structures with open walls, such as parking garages, pavilions and gazebos shall be considered outdoor portions of a parcel of real property.

*Property line* means that real or imaginary line and its vertical extension which separates real property owned or controlled by any person from contiguous real property owned or controlled by another person, or separates real property from the public premises.

*Public premises* means all real property, including appurtenances on the property, which is owned or controlled by any public governmental entity and shall include streets, alleys, parks and waterways.

*Recreational and educational activity* means any game, sport or other activity, whether on public or private property, which a person is pursuing for educational purposes or for the purpose of amusement and enjoyment, but shall not include recreational motorized vehicles or the use of equipment which amplifies sound.

*Recreational motorized vehicle* means all recreational vehicles, whether or not duly licensed and registered, including but not limited to commercial or noncommercial racing vehicles, motorcycles, go-carts, snowmobiles, amphibious craft, campers and dune buggies, but not including motorboats.

*Residential premises* means any premises where single or multiple dwelling units exist and shall include schools, churches, hospitals, nursing homes and similar institutional facilities.

*Soft test site* means any test site having the ground surface covered with grass, other ground cover, or similar absorptive material for half or more of the distance between the microphone target point and the microphone location point.

*Sound* means energy that is transmitted by longitudinal pressure waves in air or other material and is the objective cause of the sensation of hearing.

*Sound amplification system* means any radio, tape player, compact disc player, loudspeaker or other electronic device used for the amplification of sound.

*Sound level* means a measure of the level of a sound with a weighing network in the measurement chain.

*Sound level meter* means an apparatus or instrument including a microphone, amplifier, attenuator, output meter and frequency weighing networks for the measurement of sound levels.

*Vehicle* means any device in, upon, or by which any person or property is or may be transported or drawn upon a highway, except devices moved by human power or used exclusively upon stationary rails or tracks.

(Ord. No. 86-297, § 2, 5-8-1986; Ord. No. 88-663, § 1(2), 1-12-1988; Ord. No. 93-312, § 1, 5-27-1993; Ord. No. 09-242, § 1, 3-26-2009)

**Cross reference—** Definitions generally, § 1-2.

- **Sec. 12-232. - Purpose.**

This article is enacted to protect, preserve and promote the health, safety, welfare, peace and quiet for the citizens of the city through the reduction, control and prevention of excessive noise. It is the intent of this article to establish standards that will eliminate and reduce unnecessary and excessive vehicle and community noises which are physically harmful and

otherwise detrimental to individuals and the community in the enjoyment of life, property, and conduct of business.

(Ord. No. 86-297, § 1, 5-8-1986)

- **Sec. 12-233. - Application exceptions.**

   This article shall apply to the operation of all motor vehicles, both upon public premises and on other public or private premises; and it shall be unlawful for any person to operate a motor vehicle either upon or off the public streets without complying with this article; except however, the following vehicles are exempt from the operation of this article:

   (1)
   Any motor vehicle engaged in a professional or amateur sanctioned competitive sports event on public or private property where such events are otherwise a lawful and permitted use of the property.

   (2)
   Agricultural equipment either on job site or traveling on highways when used and maintained in accordance with manufacturer's specifications.

   (3)
   Any vehicle operated by any federal or state military organization and designed for use in field operations, but not including vehicles such as staff cars and personnel carriers designed primarily for normal highway use.

(Ord. No. 86-297, § 7, 5-8-1986; Ord. No. 94-100, § 7, 2-10-1994)

- **Sec. 12-234. - Undue hardship.**

   Applications for a permit for relief from the sound levels designated in this article, except for motor vehicles operated on a public street or highway, may, on the basis of undue hardship, be made to the noise control officer. Any permit granted by the noise control officer under this article shall contain all conditions upon which the permit has been granted and shall specify a reasonable time that the permit shall be effective. The noise control officer may grant the relief as applied for only if he finds that:

   (1)
   Additional time is reasonably necessary for the applicant to alter or modify his activity or operation to comply with this article; or

   (2)
   The activity, operation, or noise source will be of a temporary duration, and cannot be done in a manner that would comply with this article; and

   (3)
   No other reasonable alternative is available to the applicant; and

(4)

The applicant represents that the noise source as permitted will not violate recognized safety standards. The noise control officer may prescribe any reasonable conditions or requirements he deems necessary to minimize adverse effects upon the community or the surrounding neighborhood.

(Ord. No. 86-297, § 8, 5-8-1986; Ord. No. 94-100, § 8, 2-10-1994)

- **Sec. 12-235. - Instrumentation.**

    Equipment used in making sound level measurements shall meet the following requirements:

(1)

*Sound level meter.* Sound level meters shall be of type 1, 2 or S2A, meeting the requirements of the American National Standards Institute, Inc., or its successor bodies.

(2)

*Sound level calibrator.* An acoustic calibrator of the coupler type, accurate to within 0.5 dB, shall be utilized for the calibration of sound level meters.

(3)

*Windscreen.* A properly installed windscreen recommended by the manufacturer of the sound level meter shall be used.

(4)

*Calibration.* Each sound measuring instrument shall be returned to the manufacturer or its authorized service center or other qualified laboratory for calibration once every three years. Calibrations shall be to standards traceable to the National Bureau of Standards.

(Ord. No. 86-297, § 5, 5-8-1986; Ord. No. 94-100, § 5, 2-10-1994)

- **Sec. 12-236. - Instrument operator training.**

    Persons conducting sound level measurements under the provisions of this article shall be trained by a recognized school or a person whose qualifications have been approved by the noise control officer. This training shall include but is not limited to techniques of sound measurements and operation of sound measuring instruments.

(Ord. No. 86-297, § 6, 5-8-1986; Ord. No. 94-100, § 6, 2-10-1994)

- **Secs. 12-237—12-260. - Reserved.**


- **DIVISION 2. - COMMUNITY NOISE LEVEL STANDARDS (VEHICLES ON PUBLIC PREMISES EXCEPTED)**

- **Sec. 12-261. - Exceptions.**

    The provisions of this division do not apply to vehicles located on public premises.

    (Ord. No. 94-100, § 3, 2-10-1994)

- **Sec. 12-262. - Exemptions.**

    The sound levels in section 12-265 shall not apply to sounds emitted from the following:

    (1)
    Any bell or chime from any clock, school or church.

    (2)
    Any siren, whistle, horn or bell used by emergency vehicles or any other alarm systems used in case of fire, collision, civil defense, burglary, police activity or imminent danger; however, no burglar alarm shall remain activated for more than 15 minutes after being activated and further provided that no burglar alarm shall be allowed to produce alarm sounds in excess of those specified in section 12-265 for more than 15 minutes in any two-hour period.

    (3)
    Any activity of a temporary duration which is permitted by law and for which a license or permit has been granted by the city, including but not limited to parades, sporting events, concerts and firework displays.

    (4)
    Any construction equipment operated upon residential, commercial, industrial or public premises during the time period between 7:00 a.m. and 10:00 p.m.; however, operation of construction equipment between the hours of 10:00 p.m. and 7:00 a.m. shall not exceed the maximum sound levels specified in section 12-265, and further provided that such equipment shall be equipped with a properly installed muffler in good working order.

    (5)
    Any domestic power equipment operated upon any residential, commercial, industrial or public premises during the time period between 7:00 a.m. and 10:00 p.m. provided that such equipment does not exceed a sound level of 80 dB(A) when measured at a minimum of 25 feet from the noise source, and further provided that between the hours of 10:00 p.m. and 7:00 a.m. such equipment does not exceed the maximum sound levels specified in section 12-265.

    (6)
    Any emergency work.

    (7)
    Any detonation of explosives used to fragment rock for mining, quarrying, excavation and construction.

(8)

Any recreational and educational activity, including but not limited to school bands and neighborhood ball games, provided that between the hours of 10:00 p.m. and 7:00 a.m. such activity does not exceed the maximum sound levels specified in section 12-265.

(9)

Licensed refuse collection vehicles operated during the time period between 7:00 a.m. and 10:00 p.m.; however, sounds emitted from licensed refuse collection vehicles operated upon or within 150 feet of any residential premises between the hours of 10:00 p.m. and 7:00 a.m. shall not exceed the maximum sound levels specified in section 12-265.

(10)

Aircraft.

(11)

Animals.

(12)

Motor vehicles operated on public premises.

(13)

Noise sources within multifamily dwellings, office and apartment complexes, condominiums and similar structures occupied by more than one tenant which impact only those persons within the same dwelling, complex or building.

(Ord. No. 86-297, § 3.2, 5-8-1986; Ord. No. 88-663, § 1(3.2), 1-12-1988; Ord. No. 94-100, § 3.2, 2-10-1994)

- **Sec. 12-263. - Method of enforcement.**

 (a)

The noise control officer, or any sworn peace officer, shall be responsible for enforcing all of the provisions of this division. Where a violation of any provision of this article is found, the noise control officer and any person acting under his supervision are authorized to:

(1)

Appear before a municipal court magistrate to make an affidavit under oath and request that a summons be issued for a person where there is probable cause for believing that the person is in violation of this article, requiring the person to appear in municipal court to answer charges of the violation.

(2)

Serve as a witness, and to provide evidence of the violation, at the request of a person who has registered a noise complaint and wish to appear before a municipal court magistrate for the purpose of making an affidavit under oath and requesting that a summons be issued for the person where there is probable cause to believe that the person is in violation of this article, requesting the person to appear in the municipal court to answer charges of the violation.

(b)

Where the provisions of this division are enforced by a sworn peace officer, the peace officer shall proceed with enforcement under any method available to him pursuant to the laws of the state.

(Ord. No. 86-297, § 3.4, 5-8-1986; Ord. No. 88-663, § 1(3.4), 1-12-1988; Ord. No. 99-766, 9-23-1999)

- **Sec. 12-264. - Measurement procedure.**

   The sound level meter shall be operated in accordance with the instrument manufacturer's instructions and as follows:

(1)

*Microphone orientation.* The microphone shall be pointed towards the allegedly offensive noise source unless the instrument manufacturer's instructions specifically indicate otherwise.

(2)

*Meter setting.* The meter shall be set for the A-weighted network and slow response mode.

(3)

*Calibration.* An external calibration check and battery check shall be made before and after each use.

(4)

*Meter readings.* The recorded reading shall be the highest sound level obtained with the allegedly offensive noise source in operation, disregarding unrelated peaks due to extraneous ambient noises.

(5)

*Ambient conditions.* Measurements shall be made only when the A-weighted ambient sound level, including wind effects and all sources other than the noise source being measured, is at least ten dB(A) lower than the sound level of the noise source being measured; however, no source shall emit noise in excess of 86 dB(A) when measured 25 feet or more from the source.

(6)

*Sound level measurement.* Sound levels shall be measured at the approximate location of the property line or the boundary of the public premises, at a height of at least four feet above the immediate surrounding surface.

(7)

*System distance.* In no case shall the operator or observer be closer than two feet from the system's microphone, nor shall he locate himself between the microphone and the noise source being measured.

(Ord. No. 86-297, § 3.3, 5-8-1986; Ord. No. 88-663, § 1(3.3), 1-12-1988; Ord. No. 94-100, § 3.3, 2-10-1994)

- **Sec. 12-265. - Sound levels by receiving land use.**

  (a)

  No person shall operate, cause to be operated or generate any source of sound in such a manner as to create a sound level which exceeds the following limits when measured at or within the property line of the receiving land use:

  *Sound Levels by Receiving Land Use*

| Receiving Land Use Category | Time | Sound Level Limit dB(A) |
|---|---|---|
| Residential, public space open space, agricultural, institutional property | 7:00 a.m.—10:00 p.m. | 55 |
| | 10:00 p.m.—7:00 a.m. | 50 |
| Commercial or business | At all times | 62 |
| Industrial | At all times | 70 |

  When a noise source can be identified and its sound measured in more than one land use category, the sound level limits of the most restrictive land use category shall apply.

  (b)

  No person shall operate, cause to be operated, or generate any source of sound which is electronically amplified, or permit to be operated any sound amplification system such that the audible sound is discernible by the human ear at or within the property boundary of any adjoining or nearby residential premises between the hours of 10:00 p.m. and 7:00 a.m., except that the operation or generation of any electronically amplified sound originating from any commercial or industrial establishment used to page or notify individuals or to announce information shall not be permitted at any time if the audible sound is discernible by the human ear at or within the property boundary of any residential premises.

  (Ord. No. 86-297, § 3.1, 5-8-1986; Ord. No. 88-663, § 1(3.1), 1-12-1988; Ord. No. 93-312, § 2, 5-27-1993; Ord. No. 94-100, § 3.1, 2-10-1994)

- **Secs. 12-266—12-290. - Reserved.**

- **DIVISION 3. - MOTOR VEHICLES AND SOUND AMPLIFICATION SYSTEMS ON PUBLIC PREMISES AND SOUND AMPLIFICATION SYSTEMS ON PREMISES OF PUBLIC ACCESS[7]**

- **Sec. 12-291. - Method of enforcement.**

    The chief of police, and officers under his supervision, shall enforce all of the provisions of this division. Violations shall subject persons to citation to appear in municipal court, or other lawful enforcement action.

    (Ord. No. 86-297, § 4.3, 5-8-1986; Ord. No. 94-100, § 4.3, 2-10-1994)

- **Sec. 12-292. - Measurement procedure.**

    (a)

    *Sound level meter operation.* The sound level meter shall be operated in accordance with the instrument manufacturer's instructions and as follows:

    (1)

    The microphone shall be located at a height of not less than two feet (0.6m) nor more than six feet (1.8m) above the plane of the roadway surface and not less than 3½ feet (1.1m) and not more than 4½ feet (1.4m) above the surface on which the microphone stands.

    (2)

    a.

    When the sound level measurement system is handheld or is otherwise monitored by a person located near its microphone, the holder must orient himself relative to the highway in a manner consistent with the recommendation of the manufacturer of the sound level measurement system.

    b.

    In no case shall the holder or observer be closer than two feet (0.6m) from the system's microphone, nor shall he locate himself between the microphone and the vehicle being measured.

    (3)

    The microphone shall be oriented toward the measurement area consistent with the recommendation of the sound level instrument's manufacturer. If the manufacturer does not recommend an orientation for its microphone, the microphone shall be pointed towards the vehicle being measured.

    (4)

    The meter shall be set for the A-weighted network and fast response mode.

    (5)

An external calibration check and battery check shall be made before and after each period of use and at intervals not exceeding two hours when the instrument is used longer than a two-hour period.

(6)
Measurements shall be made of the sound level generated by the motor vehicle regardless of the highway grade, load, acceleration or deceleration.

(7)
The sound level generated by the motor vehicle is the highest reading observed on the sound level meter as the vehicle passes through the measurement area, corrected, when appropriate, in accordance with the rules in subsection (c) of this section. The sound level of the vehicle being measured must be observed to rise at least six dB(A) before the maximum sound level occurs and to fall at least six dB(A) after the maximum sound level occurs in order to be considered a valid sound level reading.

(b)
*Test site measurement area requirements.*

(1)
*Standard test sites.*

a.
Measurements shall be made at a test site which is adjacent to and includes a portion of a traveled lane of a public highway. A microphone target point shall be established on the centerline of the traveled lane of the highway, and a microphone location point shall be established on the ground surface not less than 35 feet (10.7m) or more than 83 feet (25.3m) from the microphone target point and on a line that is perpendicular to the centerline of the traveled lane of the highway and that passes through the microphone target point. In the case of a standard test site, the microphone location point is 50 feet (15.2m) from the microphone target point. Within the test site is a triangular measurement area. A plan view diagram of a standard test site, having an open site within a 50-foot (15.2m) radius of both the microphone target point and the microphone location point, is shown in figure 1. Measurements may be made at a test site having smaller or greater dimensions in accordance with the rules in subsection (b)(2).



**Standard Test Site Highway Operations**

b.

The test site must be an open site, essentially free of large sound-reflecting objects. However, the following objects may be within the test site, including the triangular measurement area:

1.

Small cylindrical objects such as fire hydrants or telephone or utility poles;

2.

Mailboxes;

3.

Traffic railings of any type of construction except solid concrete barriers (see subsection (c)(3)d. of this section); or

4.

One or more curbs having a vertical height of one foot (0.3m) or less.

c.

The following objects may be within the test site if they are outside of the triangular measurement area of the site:

1.

Any vertical surface (such as a billboard), regardless of size, having a lower edge more than 15 feet (4.6m) higher than the surface of the traveled lane of the highway;

2.

Any uniformly smooth sloping surface slanting away from the highway (such as a rise in grade alongside the highway) with a slope that is less than 45 degrees above the horizontal;

3.

Any surface slanting away from the highway that is 45 degrees or more and not more than 90 degrees above the horizontal, if all points on the surface are more than 15 feet (4.6m) above the surface of the traveled lane of the highway.

d.

The surface of the ground within the measurement area must be relatively flat. The test site shall be a soft test site. However, if the test site is determined to be hard, the correction factor specified in subsection (c)(2) of this section shall be applied to the measurement.

e.

The traveled lane of the highway within the test site must be dry, paved with relatively smooth concrete or asphalt, and substantially free of the following:

1.

Holes or other defects which would cause a motor vehicle to emit irregular tire, body or chassis impact noise; and

2.

Loose material such as gravel or sand.

f.

The traveled lane of the highway on which the microphone target point is situated must not pass through a tunnel or underpass located within 200 feet (16m) of that point.

(2)

*Nonstandard sites.*

a.

If the distance between the microphone location point and the microphone target point is other than 50 feet (15.2m), the test site must be an open site within a radius from both points which is equal to the distance between the microphone location point and the microphone target point.

b.

Plan view diagrams on nonstandard test sites are shown in figures 2 and 3. Figure 2 illustrates a test site which is larger than a standard test site and is based upon a 60-foot (18.3m) distance between the microphone location point and the microphone target point. Figure 3 illustrates a test site which is smaller than a standard test site and is based upon a 35-foot (10.7m) distance between the microphone location point and the microphone target point.



*Nonstandard Test Site 60 feet*



*Nonstandard Test Site 35 feet*

(c)

*Correction factors.* The rules in this subsection specify correction factors which are added to or subtracted from the reading of the sound level generated by a motor vehicle, as displayed on a sound level measurement system, during the measurement of the motor vehicle's sound level emissions at a test site which is not a standard site. The purpose of adding or subtracting a correction factor is to equate the sound level reading actually generated by the motor vehicle to the sound level reading it would have generated if the measurement had been made at a standard test site.

(1)

*Distance correction factors.* If the distance between the microphone location point and the microphone target point is other than 50 feet (15.2m), the maximum observed sound level reading generated by the motor vehicle shall be corrected as specified in the following table:

_____

*Distance Correction Factors*

| Distance Between the Microphone Location Point and the Microphone Target Point Is: | Value dB(A) To Be Applied to the Observed Sound Level Reading: |
|---|---|
| 35 feet (10.7m) or more but less than 39 feet (11.9m) | -3 |
| 39 feet (11.9m) or more but less than 43 feet (13.1m) | -2 |

| | |
|---|---|
| 43 feet (13.1m) or more but less than 48 feet (14.6m) | -1 |
| 48 feet (14.6m) or more but less than 58 feet (17.7m) | 0 |
| 58 feet (17.7m) or more but less than 70 feet (21.3m) | +1 |
| 70 feet (21.3m) or more but less than 83 feet (25.3m) | +2 |

_____

(2)

*Ground surface correction factors.* When measurements are made at a test site which is hard, a correction factor of 2 dB(A) shall be subtracted from the maximum observed sound level reading generated by the motor vehicle.

(3)

*Sound-reflecting surface correction factors.* The distances between the microphone line and its nearest sound-reflecting surface and between the centerline of the lane of travel and its nearest sound-reflecting surface shall be measured. These distances shall be located on the nomogram in figure 4 on their respective axis, and the two marks shall be connected by a straight line. The point on the central axis that is intersected by the straight line indicates the dB correction factor that shall be applied to the sound level reading obtained from such vehicle passing through the site. (The dotted line in figure 4 illustrates a -2 dB(A) correction for sound-reflecting surfaces at 52 feet from the center of the lane of travel and 25 feet from the microphone line.)

a.

The correction factors determined by the nomogram in figure 4 shall be used only for sound-reflecting surfaces that are parallel to the lane of travel.

b.

Basically parallel surfaces may have irregularities or projections of not more than two feet, measured perpendicular to the lane of travel, with the distance shown in figures 1, 2 and 3 measured from the nearest projecting surfaces.

c.

Sound-reflecting surfaces not basically parallel to the lane of travel shall be a distance as specified in subsections (a)(1) and (a)(2) of this section. This restriction does not apply to surfaces that are perpendicular to the lane of travel and behind the parallel surface for which corrections are made, such as a fence, or the sidewalls of a building.

d.

Distance measurements from smooth embankments covered with vegetation, concrete, asphalt, dirt, or other relatively smooth cover shall be made from the point where the slope begins to

exceed 45 degrees above horizontal. Measurements from nonsmooth embankments shall be made from the point where the irregularity begins.

(d)
*Application of correction factors.* If two correction factors apply to a measurement, they are applied cumulatively.



ON CENTER LINE READ dB CORRECTION
TO BE SUBTRACTED FROM METER READING

FIGURE 4

*Distance From Center of Vehicle Path*

(Ord. No. 86-297, § 4.2, 5-8-1986)

- **Sec. 12-293. - Sound levels by vehicle type.**

No person shall operate a motor vehicle upon any public premises, or be permitted to operate a motor vehicle upon any public premises at any time or under any conditions of roadway grade, load, acceleration or deceleration in such a manner as to generate a sound level in excess of the following limits for the category of motor vehicle and applicable speed under measurement procedures established in this division:

| | Sound Levels by Vehicle Type | | |
|---|---|---|---|
| Type of Vehicles | Speed Limit Zone 35 mph or Less | Speed Limit Zone Over 35 mph | |
| | | | |
| (1) | Motorcycles and motor-driven cycles | 82 dB(A) | 86 dB(A) |
| (2) | Vehicles with gross weight of 10,000 pounds or over | 86 dB(A) | 90 dB(A) |
| (3) | Vehicles with gross weight under 10,000 pounds | 80 dB(A) | 84 dB(A) |

(Ord. No. 86-297, § 4.1.1, 5-8-1986; Ord. No. 93-312, § 3, 5-27-1993; Ord. No. 94-100, § 4.1.1, 2-10-1994)

- **Sec. 12-294. - Standing motor vehicles.**

No person shall operate or permit the operation of any motor vehicle with a gross vehicle weight rating (GVWR) in excess of 10,000 pounds, or any auxiliary equipment attached to such a vehicle, for a period longer than ten minutes in any hour while the vehicle is stationary, for reasons other than traffic congestion, within 150 feet (46m) of a residential area, between the hours of 10:00 p.m. and 7:00 a.m. the following day.

(Ord. No. 86-297, § 4.1.2, 5-8-1986; Ord. No. 94-100, § 4.1.2, 2-10-1994)

- **Sec. 12-295. - Licensed refuse collection vehicles.**

The maximum permissible sound level as specified in section 12-293 shall not apply to sounds emitted from refuse collection vehicles operated on public premises during the time period between 7:00 a.m. and 10:00 p.m.; however, sounds emitted from refuse collection vehicles operated within 150 feet of residential premises between the hours of 10:00 p.m. and 7:00 a.m. shall not exceed the maximum sound levels as specified in section 12-293.

(Ord. No. 86-297, § 4.1.3, 5-8-1986; Ord. No. 94-100, § 4.1.3, 2-10-1994)

- **Sec. 12-296. - Horns and signaling devices.**

    No person shall sound any horn or signaling device on any truck, automobile, motorcycle, or other vehicle on any street or highway, except as a danger warning, and then only for a reasonable period of time.

    (Ord. No. 86-297, § 4.1.4, 5-8-1986; Ord. No. 94-100, § 4.1.4, 2-10-1994; )

- **Sec. 12-297. - Sound amplification systems.**

    (a)

    No person shall operate or cause to be operated any sound amplification system, either in a motor vehicle or separate from a vehicle, on any public premises so as to produce an audible sound measured at least 25 feet from the system. (MAC: This is below ordinary speech levels and is at odds with the rest of the code allowing greater sound levels elsewhere. It also defeats the whole point of using amplification. Under this subsection, a person on the public sidewalk is more restricted than a person projecting sound from private property. This appears to be an attempt at controlling the obnoxious car speakers.) Measurement of the audible sound shall be by the auditory senses, based on direct line of sight.

    (b)

    No person shall operate or cause to be operated any sound amplification system, either in a motor vehicle or separate from a vehicle, on any premises of public access so as to produce an audible sound measured at least 25 feet from the system. Measurement of the audible sound shall be by the auditory senses, based on direct line of sight. If the person operating or causing to be operated the sound amplification system is the owner or lessee of the real property upon which the sound amplification system is being operated, then the provisions of section 12-265 of this article shall apply rather than the provisions of this subsection. Absent compelling circumstantial or documentary evidence that the person operating or causing to be operated a sound amplification system on any premises of public access has a possessory interest in the real property upon which the system is being operated, the presumption shall be that the person operating or causing to be operated a sound amplification system on any premises of public access is neither an owner nor a lessee of the real property upon which the system is being operated. In any proceeding instituted pursuant to the provisions of section 12-291 of this division for violation of this subsection, the person subject to such proceeding may assert holding a possessory interest in the real property upon which the sound amplification system was operated as an affirmative defense.

    (c)

    This section shall make no distinction between stopped, standing, parked or moving motor vehicles.

    (d)

    Possession by a person of the sound amplification system in subsection (a) or (b) of this section shall be prima facie evidence that the person operated the system.

    (e)

    Exemptions (1), (2), (3), (6) and (8) of section 12-262 shall apply to this section.

(Ord. No. 86-297, § 4.1.5, 5-8-1986; Ord. No. 93-312, § 4, 5-27-1993; Ord. No. 94-100, § 4.1.5, 2-10-1994; Ord. No. 09-242, § 3, 3-26-2009)

- **Secs. 12-298—12-330. - Reserved.**

Secs. 12-207—12-230. - Reserved.

# EXHIBIT D

ARTICLE VI. - ORGANIZED EVENTS[4]

DIVISION 1. - GENERALLY

Sec. 23-201. - Purpose; definitions.

(a)

Purpose . In order to preserve and protect the rights guaranteed under the First Amendment of the United States and Alabama Constitutions and to provide for the safe and orderly use of public property, for both First Amendment activity and activity that is not protected by the First Amendment, this article is intended to establish reasonable time, place, and manner regulations for the use of public property characterized as traditional public forums. The regulations are designed to be content-neutral, narrowly tailored to serve significant governmental interests, and to leave open ample alternative channels for communications of information. The regulations are also intended to coordinate multiple uses of limited space; assure preservation of public facilities and improvements; prevent dangerous, unlawful, or impermissible uses of public property; protect the public safety; ensure that city resources are deployed efficiently and effectively; provide for fees and cost recovery; address secondary harms; and authorize and establish objective standards in the administration of this article.

(b)

Definitions . The following words, terms and phrases, when used in this article, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning:

Assembly means a gathering of individuals organized by an event organizer for a common purpose, which is intended to remain in the same general location.

Basic event means an organized event which:

(1)

Does not require or include for the conduct of the event the use of an enhancement;

(2)

Does not require approval, licensing, or permitting pursuant to other city laws, including the city's alcoholic beverage laws, technical and fire codes, and business license code, and laws administered by the health department;

(3)

Does not require city event services in excess of the standard complement; and

(4)

Is not expected to have more than 500 participants at any one time during the event.

Business day means a day on which the city administrative offices are open for regularly conducted business and does not include Saturdays, Sundays, official city holidays, or a day on which weather or other conditions have made the city's administrative offices inaccessible.

Capacity limit means the capacity limit for the public space upon which an assembly is to be conducted, as follows:

(1)

The stated capacity of a given public space established by policy or practice;

(2)

If there is no stated capacity, then the capacity of the public space based on a formula of nine square feet per participant, which is arrived at by taking the square footage of the public area generally available for occupancy by participants and dividing the number by nine; or

(3)

An adjusted increase or decrease in the capacity limit established by the event administrator at the time of permitting or during the event conduct, should the administrator determine that such adjustment is warranted taking into account the public safety and event conduct.

Clear zone means the areas described in chapter 25, article IX of this Code that are to remain unobstructed, which, in the case of an organized event means unobstructed by objects or an assembly of participants.

City event services are city services provided or required by the event administrator as a result of event conduct.

City event services standard complement or standard complement means those city event services normally available to be assigned or provided to an organized event by the event administrator in accordance with standard policy or procedure.

City services mean generally available services of the city, including labor and materials, which are provided by the city for an organized event, including public safety services such as safety, traffic and crowd control, public works services, and the use of public structures, instrumentalities, or equipment. The term does not include services provided under a contract with the city or an employee of the city on an extra-duty or off-duty status, including traffic control or security.

Conditional application means an application for a special event permit that is complete in all respects except for required approval, licensing, or permitting pursuant to other city laws or laws administered by the health department, or except for required leasing of the public space.

Enhancements include facilities, structures, equipment, instrumentalities, or animals used in the conduct of an event that require permitting under the city's technical or fire codes or are reasonably likely to create a secondary harm, such as stages, fencing, **generators**, barricades, pyrotechnics, inflatables, motorized vehicles, utility poles, floats, booths, canopies, and tents. The term does not include small objects that can be accommodated within the public space used for the event without

implicating the foregoing requirement or concern, such as coolers, signage, folding chairs or tables, small tents or canopies, accommodation for the handicap, or small portable equipment that does not require electricity.

Enhanced event means an organized event which:

(1)

Requires or includes the use of an enhancement;

(2)

Requires approval, licensing, or permitting pursuant to other city laws, including the city's alcoholic beverage laws, technical and fire codes, and business license code, and laws administered by the health department;

(3)

Requires city event services in excess of the standard complement; or

(4)

Is expected to have more than 500 participants at any one time during the event.

Event administrator means the chief of police, or his designee.

Event conduct or conduct of the event means the time, place, or manner in which an event is conducted by or for participants, including event set-up and take-down, and which has nothing to do with the content of protected forms of speech, or the conduct of non-participants including counter-protesters or hecklers.

Event organizer or organizer means a person organizing, sponsoring, initiating, coordinating, promoting, or holding an organized event. The term does not include a person who provides only incidental funds or support for an organized event and who does not otherwise have responsibility for the event.

Extended event means an organized event that occurs, with or without interruption, for more than 20 dates over a consecutive six-month period. An extended event shall be deemed to include the same organized event or an event organized by the same event organizer.

For-profit event means an organized event which is primarily intended as a profit-making or revenue raising enterprise for any person that is not a non-profit organization. The term also means an organized event that is conducted primarily for the sale, demonstration, advertisement, or promotion of products, goods, or services.

Include or including does not limit a term to a specified example.

Major arterial means a street or highway of great continuity designed to accommodate the highest traffic volumes and longest trip desires. Major arterials are defined and designated in the city's major street plan.

Minor event means an organized event which:

(1)

Will be conducted at a time and place and in a manner that complies with applicable laws, including section 23-232 of this article;

(2)

Does not require or include for the conduct of the event the use of an enhancement;

(3)

Does not require approval, licensing, or permitting pursuant to other city laws, including the city's alcoholic beverage laws, technical and fire codes, and business license code, and laws administered by the health department;

(4)

Does not require city event services including the standard complement;

(5)

In the case of an organized event conducted on a street, does not have more than 25 vehicles at any one time during the conduct of the event;

(6)

In the case of an organized event conducted in a park, does not have more than 300 participants at any one time during the conduct of the event, subject to applicable capacity limits for the public space;

(7)

In the case of an organized event conducted on a sidewalk, does not have participants at any one time during the conduct of the event whose number exceeds 50 participants in the case of an assembly and 100 participants in the case of a procession, subject to applicable capacity limits for the public space;

(8)

Is not a sound event; and

(9)

Is not a for-profit event.

Notice means the sending of any notice or notification required under this article to the appropriate address, by personal delivery, facsimile, electronic mail, first class mail, or certified mail return receipt requested; and the receipt thereof within the time specified in this article, which receipt shall be deemed to occur as follows: upon delivery in the case of personal delivery, upon

confirmation of delivery in the case of facsimile and electronic mail, three days after mailing in the case of first class mail, and as indicated in the return receipt in the case of certified mail.

Organized event means an assembly or procession, or a combination thereof.

Park means public park grounds under the control of the city and shall include the sidewalks within but not immediately adjacent to the park, unless expressly permitted otherwise.

Park amenities mean features of a park such as picnic tables, small shelters, and gazebos, which are generally available for public use in accordance with park regulations on a first-come-first-serve basis with or without the need for a reservation or a permit.

Park facilities mean those park grounds or those buildings, structures, facilities, or improvements within a park, which are dedicated, designed, or intended for specific uses, including recreation centers, senior citizen centers, park buildings, nature preserves, nature centers, sports facilities, model airplane fields, tot lots, lakes, and picnic shelters.

Park regulations mean city laws or stated departmental policy or practice of general application, which govern the use of or conduct within parks.

Participants mean only those persons actually taking part in the event, including those organizing the event, those invited to attend, those paying to attend, or those for whom the event is organized including the general public.

Procession means a gathering of individuals organized by an event organizer for a common purpose, which is not intended to remain in the same general location, but to proceed along a route without unreasonable delay.

Prior use means a use of public property which takes precedence over a proposed organized event because the prior use is:

(1)

Another organized event that is first in time;

(2)

The subject of an already-pending or executed lease or license; or

(3)

A scheduled state or city project, activity, or event.

Public facilities mean those municipal buildings, structures, facilities, or improvements dedicated, designed, or intended for specific uses which are not considered to be traditional public forums, including civic centers, sports facilities, park facilities, cemeteries, public garages, parking lots, museums, or other such municipal buildings, structures, facilities, or improvements.

Public place, public space, or public area means public property of the city that is generally available for organized events including public streets, sidewalks, and parks.

Public safety means the health, security, and safety of the public, including the general public, event participants, and public employees.

Restoration reimbursement costs mean those losses, damages, costs, or expenses that are incurred or suffered by the city as a result of event conduct for which the city is due to be reimbursed or compensated. In no event shall "restoration reimbursement costs" mean or refer to those losses, damages, costs, or expenses that are incurred or suffered by the city as a result of the conduct of nonparticipants.

Secondary harm refers to the danger, damage, injury, or unreasonable inconvenience, interference, demand, or annoyance, to or on adjacent or nearby uses, the general public, public property, the use of public space, other organized events, city resources, or public safety, resulting or likely to result from event conduct.

Sidewalk means that portion of a public right-of-way under the control of the city that is generally between the curb line or lateral line of the street and the adjacent property line, or public easements located on private property, which portion is dedicated or intended for use by pedestrians.

Sound event means an organized event which involves the use of amplified sound or the production of noise which would violate the city's noise ordinance found in chapter 12, article V of this Code.

Special event means an organized event that is required to obtain a permit under this article.

Special event permit or event permit means a permit issued pursuant to this article.

Sports facilities mean public property designed, used, or maintained primarily for the purpose of athletic events, competitions, or exhibitions, including ball fields, skateboard parks, equestrian facilities, ice skating rinks, concession stands, swimming pools and pool houses, bocci courts, hockey courts, volleyball courts, tennis courts, basketball courts, and multi-purpose courts.

Street means any public road, thoroughfare, avenue, boulevard, parkway, drive, or other public way dedicated or used primarily for purposes of vehicular traffic that is under the control of the city.

(Ord. No. 13-189, § 1, 5-9-2013)

**Sec. 23-202. - Property and activities not covered.**

(a)

Property not covered .

(1)

Unless the organized event requires for its successful execution the provision of city event services in accordance with subsection (d) of this section, this article is not intended to regulate organized events that are not conducted on public property or property which is not otherwise under the control or jurisdiction of the city, including the following:

a.

Private property;

b.

Property which is under the control or jurisdiction of the federal government or any agency or instrumentality of the federal government;

c.

Property which is under the control or jurisdiction of the state or any agency or instrumentality of the state unless the state has specifically authorized the city to control the use of such property for organized events; or

d.

Property which is under the control or jurisdiction of municipal boards or agencies.

(2)

Public facilities . Unless the organized event requires for its successful execution the provision of city event services in accordance with subsection (d) of this section, this article is not intended to regulate organized events which are conducted upon or within public facilities; provided, however, such facilities may be designated by city policy as available for organized events regulated pursuant to this article, but only to the extent such designation does not interfere with the dedicated, designed, or intended use of such facilities, or is not contrary to any applicable limitations on the property. Nothing in this subsection (a) shall be construed to prevent the city from charging rent or a use fee for the use of public facilities, including those facilities made available for organized events regulated by this article.

(b)

Activities not covered .

(1)

This article shall not apply to funeral processions, programmed activities provided or managed by the city such as recreational programs, military or other official convoys or motorcades, or other activities upon public property which are regulated or permitted by other provisions of this Code.

(2)

This article is not intended to regulate or allow the use of public property solely for the conduct of a commercial enterprise including the sale, demonstration, advertisement, or promotion of products, goods, or services. Such uses of public property shall be regulated by applicable laws including zoning and franchising laws and laws governing sales in the central city area. Notwithstanding the immediately foregoing provision, sponsor events in the central city area, which involve multiple vendors of permitted activities, which activities are those set forth in section 18-36(e) of this Code, operating under a sponsor shall be governed by this article.

(c)

Exclusion from the terms of this article pursuant to this section does not relieve the person responsible for an event from the responsibility of obtaining permission or authorization from the appropriate person for the use of property or conduct of activities that are not covered by this article.

(d)

City event services . Where an organized event otherwise excluded from the requirements of this article in accordance with subsection (a) of this section requires for its successful execution the provision of city event services, the event organizer must make application for a special event permit in accordance with this article. The event organizer may be required to pay for the city event services costs, including the standard complement, provided for the event.

(Ord. No. 13-189, § 1, 5-9-2013)

**Sec. 23-203. - General conditions.**

(a)

Organized events . All organized events, including special events, regulated by this article shall be subject to the following conditions:

(1)

Organized events shall be conducted in a safe and sanitary manner.

(2)

Immediately following the termination of an organized event, the event organizer shall be responsible for restoring the public area used for the event and public property damaged by the event to its condition prior to the commencement of the event, or where public property is damaged beyond repair replacing it; where such restoration or replacement is necessitated by event conduct.

(3)

At any time prior to or during the event, the event administrator shall have the authority to condition, limit, or prohibit an organized event in the construction or use of enhancements in order to address a secondary harm.

(4)

Participants in an organized event shall comply with this article and conditions imposed pursuant to this article, and shall otherwise comply with applicable law.

(5)

The issuance of a special event permit or the right to use public space for an organized event pursuant to this article shall not entitle the participants to use public property not regulated by this article, including public facilities.

(6)

The use of the parks for an organized event shall be subject to applicable park regulations, unless specifically waived in the special event permit, including regulations concerning park closure, use of park amenities and charges for their use, and conduct in the park.

(7)

The conduct of an event, including that of its participants, shall not prevent access to uses adjacent to the site of the event, including public facilities, unless permission has first been obtained from the owner or person in control thereof.

(8)

An organized event shall not protest or picket before the residence or dwelling of any individual who is the target of the protest or picket.

(9)

Organized events shall be conducted during daylight hours, except in areas possessing sufficient artificial light which provides enough illumination throughout the event area to protect public safety.

(10)

Event conduct, including that of its participants, shall not obstruct or impede vehicular access to and from properties adjacent to the event, unless the event administrator determines that to do so would not be likely to cause a hazard to public safety, an unreasonable inconvenience to the traveling public, or an unreasonable hardship to adjacent uses.

(11)

Event conduct, including that of its participants, shall not assemble or place an object in the clear zone, unless specifically relieved of this condition by the event administrator in the event permit.

(12)

No organized event shall be conducted upon a major arterial unless a special event permit has been issued allowing the event to be conducted on the major arterial because the magnitude of the event requires it and such an event cannot reasonably be accommodated elsewhere. This subsection (12) shall not apply to an organized event that is a procession that merely crosses a major arterial and that is not otherwise prohibited according to the terms of this article.

(13)

Handicap access installed on the public space shall be preserved or an acceptable alternative provided.

(14)

In the case of a procession, the event shall move from its point of origin to the point of termination without unreasonable delays en route.

(15)

Event participants shall not wear gas masks or use other devices that are designed, used, or intended to be used to interfere with the ability of the police to control or manage crowds.

(16)

The number of participants in an organized event shall not exceed applicable capacity limits for the public space and shall not exceed the number of participants established for the type of event being conducted.

(17)

Participants of an organized event shall not encamp on public space. [No Occupy Wall Street]

(18)

An organized event shall be subject to the city's alcoholic beverage regulations found in chapter 3 of this Code.

(19)

Where there is more than one organized event conducted upon a sidewalk in the same general area, the events shall be conducted generally at least ten feet apart, unless the special event permit allows otherwise.

(b)

Special events . In addition to the conditions of subsection (a), special events regulated by this article shall be subject to the following conditions:

(1)

A special event shall be conducted within the area or route designated in the permit for the event during the conduct of the event.

(2)

At least one organizer of the special event shall carry the special event permit upon their person during the conduct of the event.

(c)

Additional conditions . The event administrator may establish such other reasonable conditions in the conduct of an organized event at the time of permitting or during the conduct of an event which the administrator considers to be reasonably necessary in order to carry out the provisions of this article, consistent with its stated purpose, including addressing secondary harms. A violation of such conditions shall constitute a violation of this article.

(Ord. No. 13-189, § 1, 5-9-2013)

**Sec. 23-204. - Public conduct.**

(a)

No person, including participants in another organized event, shall unreasonably hamper, obstruct, impede, or interfere with an organized event or with any person, vehicle, or animal participating or used in the event.

(b)

No driver of a vehicle shall drive between the event's units, participants, or vehicles that are in motion and conspicuously designated as being a part of the event, unless otherwise directed to do so by law enforcement personnel.

(c)

The chief of police shall have the authority, when reasonably necessary, to prohibit or restrict the parking of vehicles along a street constituting a part of the route or location of an organized event. When necessary, the chief of police shall see that signs are posted to such effect, and it shall be unlawful for any person to park or leave unattended any vehicle in violation of such signs.

(Ord. No. 13-189, § 1, 5-9-2013)

Sec. 23-205. - Revocation or termination of an event; opportunity to cure.

(a)

Revocation; termination during event . An organized event may be terminated or special event permit revoked on the day of the event without prior written notice and without a hearing, if the mayor, the chief of police, the fire chief, or the event administrator determines that:

(1)

Revocation or termination is in the interest of the immediate public safety because of fire, casualty, act of nature, or a public emergency;

(2)

The conduct of the event violates applicable law, including provisions of this article or permit conditions, which has resulted in a secondary harm; or

(3)

A breach of the peace is occurring or an activity in the nature of a riot has occurred.

(b)

Cure . Before revoking an event permit or terminating an organized event under subsection (a)(2) of this section, the event administrator shall, if the administrator believes it reasonable to do so without comprising public safety or public property, endeavor to allow event conduct to be modified in order to cure the violation and address the secondary harm, to the administrator's satisfaction; provided, however, if city event services are required to protect public safety or public property and such services are not available, then the event permit shall be revoked or the event

terminated. Where the violation includes a failure to obtain permitting in accordance with this article, the event administrator may immediately issue a permit, provided that the secondary harm caused by event conduct has been addressed to the satisfaction of the event administrator. Nothing in this subsection (b) shall be construed to prevent the enforcement, by arrest or citation, of applicable laws.

(c)

Requirements upon termination or revocation . Upon receipt of the notification that the permit to use the public area has been revoked or the organized event terminated pursuant to this section, the event participants shall cease the event and may be directed to either disperse immediately or to commence with restoring the site to its condition prior to the event in accordance with section 23-203(a)(2) of this article.

(d)

Revocation prior to event . The event administrator shall have the authority to revoke a special event permit issued for the use of public space any time before the time the event is scheduled to commence if he determines that, due to new information or a change in circumstances, grounds to deny the application exist, in which case the event organizer may appeal the revocation in accordance with the procedures of section 23-238 of this article; provided, however, no appeal shall be available where the revocation of the event permit is done in the interest of the public safety because of fire, casualty, act of nature, or a public emergency.

(Ord. No. 13-189, § 1, 5-9-2013)

Secs. 23-206—23-230. - Reserved.

## DIVISION 2. - PERMIT REQUIREMENTS

Sec. 23-231. - Requirement; event cancellation; lease events; sound events; extended events.

(a)

Permit requirement . Except for minor events, all organized events conducted on a public area shall be required to obtain a special event permit. No person shall knowingly participate in a special event for which an event permit is required under this article unless an event permit has been issued for the event.

(b)

Event cancellation or delay . In order to prevent the unnecessary tying up of public space or city event services for a special event that does not occur as scheduled, each of the following shall apply:

(1)

Cancellation or delay of basic events and enhanced events .

a.

Basic events . The organizer of a permitted special event that is a basic event shall provide to the event administrator: (i) at least 24 hours' advance notice of a delay of more than one hour in the start time of the event on any given day of the event, and (ii) at least 48 hours' advance notice of a cancellation of the event, which, in the case of a multiple day event, means 48 hours' notice in advance of the day on which the event will not occur, if the event is not entirely cancelled.

b.

Enhanced events . The organizer of a permitted special event that is an enhanced event shall provide to the event administrator: (i) at least 48 hours of a delay of more than one hour in the start time of the event on any given day of the event, and (ii) at least five business days advance notice of a cancellation of the event, which, in the case of a multiple day event, means five business days notice in advance of the day on which the event will not occur, if the event is not entirely cancelled.

c.

Event canceled . Unless the organizer has provided the required advance notice in accordance with the immediately foregoing subsections (1)a. and b., where no participants have arrived or event set-up started at the location or starting point of a basic event or enhanced event within two hours after its scheduled starting time for any given day of the event, the event shall be deemed to have been canceled and the permit surrendered for the remainder of the event. In the case of multiple day events whose permit has been deemed surrendered, the event administrator may, upon the request of the event organizer, reinstate the permit provided that the request is made at least 20 hours before the next scheduled start time for the event and further provided that the required city event services, if any, and the public space are available.

d.

Permit denial . Failure of the same event or event organizer to provide the required advance notice of cancellation of an event three or more times within the same calendar year shall constitute grounds for denying a subsequent event permit application made during the same year for the same event organizer or same event.

e.

Reimbursement for services . Where city event services have been assigned to a special event that has been canceled by the organizer without the required advance notice, the organizer shall reimburse the city upon invoicing for costs incurred, if any, for city event services in excess of the standard complement.

f.

Weather events, etc . Notwithstanding anything to the contrary contained in this subsection (1), where the delay or cancellation of an event is necessary because of a potentially hazardous weather event or other situation beyond the organizer's control that is likely to pose a risk to public safety,

then the organizer shall be required to provide notice of the delay or cancellation of the event as soon as reasonably practicable under the circumstances.

g.

Delayed events . Events that are delayed in starting on a given day shall still end at the time stated in the permit, unless the event administrator reasonably determines that the event can end later to make up for the delay in the start time.

(2)

Cancellation of permitted minor events . With regard to a minor event that has obtained a permit, where no participants have arrived or event set-up started at the location or starting point of the event within two hours after its scheduled starting time, the permit shall be deemed to have been surrendered for that day. The minor event may still be conducted on that day, but the event will have lost its prior use status under the permit for that day.

(c)

Lease events .

(1)

As a condition of event permitting, organizers for alcoholic beverage licensed events or for-profit events may be required to obtain a lease or license from the city for the use of the public space.

(2)

In addition, the city may require a lease or license for:

a.

Those organized events which involve the use of enhancements that pose an enhanced risk to public safety or damage to public property, including events that involve dangerous instrumentalities such as pyrotechnics;

b.

Organized events that are anticipated to have in excess of 10,000 participants over the duration of the event; or

c.

Multiple-day events that will not remove from the public area the event facilities or equipment.

(3)

An event organizer that desires to have exclusive control or possession of public space upon which the event will be held may request a lease or license from the city, which the city is not obligated to grant.

(4)

A lease or license event shall be subject to the provisions of this article including applicable permitting and, in addition, the city may impose additional requirements in the lease or license including insurance, the posting of security, and indemnification requirements.

(5)

Leases or licenses for for-profit events may include use fees to be paid to the city by the event organizer for the use of the public space based on either a flat fee or percentage of gross event proceeds.

(6)

Notwithstanding anything to the contrary contained in this article, leases or licenses for for-profit events or alcoholic beverage licensed events may include provisions for cost recovery to be paid to the city for city event services.

(7)

The issuance of a lease or license shall not convert the space from a traditional public forum.

**(d)**

**Sound events** .

(1)

Sound events are subject to the approval of the city's department of natural resources and event organizers shall be required to complete an application on forms provided by the city. The application will be processed by the department of natural resources in conjunction with the processing of the special permit application by the event administrator.

(2)

In approving sound events the department of natural resources may consider, among other relevant considerations, the proposed time, location, and duration of the event; secondary harms; whether there is a more suitable alternative location or time for the event; the affect the sound levels would have on the ability of the city to conduct crowd control; the likely hardship on the successful conduct of the event if the sound event is not approved; the history of citizens' noise complaints for the same or substantially similar events or locations; and the decibel level likely to be generated by the event.

(3)

In approving a sound event the department of natural resources may attach reasonable conditions which address the impact of the sound event, such as limiting the duration or time of the event, moving the event to a more suitable location or time, setting acceptable decibel levels for the event, and dictating the positioning and direction of the amplification equipment.

(e)

Private events .

(1)

For purposes of this subsection (e), the term private event means an organized event which is intended to be limited to an invited or select group of individuals including:

a.

Parties, reunions, ceremonies, fundraisers, and other social gatherings where guests are there by invitation only;

b.

Gatherings of friends or family;

c.

Gatherings of members or guests of an organization;

d.

Gatherings for religious observances;

e.

Location shoots or tapings of films, photographs, commercials, or other similar audio or videotaped events;

f.

Events requiring paid admission or tickets; or

g.

Events involving an official who has a security detail that requires the event to be private in order to assure security.

(2)

Nothing in this article shall be construed to prevent private events from limiting access or admission to the event to those for whom the private event is organized.

(3)

The status of an organized event as a private event under this subsection (e) shall not convert the public space into a private premises for purposes of the city's prohibition against drinking in a public place found in chapter 3 of this Code.

(f)

Extended events . Where an extended event is using the same or substantially similar public space that is a preferred location for another organized event and multiple events cannot reasonably be

accommodated, the event administrator may apportion the time or public space between or among the organized events on an equitable basis, provided reasonable accommodation is made for the other event in reasonably close proximity to the preferred location.

(Ord. No. 13-189, § 1, 5-9-2013)

Sec. 23-232. - Minor events.

(a)

Permitting not required for minor events . Subject to the provisions of this section, for public spaces regulated by this article, minor events shall not be required to obtain a special event permit; provided, however, the event organizer may elect to obtain permitting in accordance with this article upon following the application procedures for a special event permit and the event shall, upon the issuance of an event permit, be considered to be a special event.

(b)

Conditions for minor events .

(1)

In the conduct of minor events, the event shall be subject to applicable provisions of this article that apply to organized events including section 23-203, general conditions, and section 23-205, revocation or termination of an event.

(2)

The use of public space by a minor event shall:

a.

Be on a first-come-first-serve basis and shall be subordinate to prior uses of the same or a substantially similar public space and multiple uses cannot reasonably be accommodated; and

b.

Not be conducted upon or in unreasonably close proximity to public property which is unavailable due to fire, casualty, acts of nature, scheduled construction or maintenance, or public emergency.

(3)

In the case of minor events conducted on the sidewalk, as required of all organized event conducted on a sidewalk, minor events on a sidewalk shall be conducted generally at least ten feet apart from other organized events; provided, however, this separation requirement shall not prevent participants of other organized events when not actually participating in their own event from simply walking along that portion of the sidewalk left unencumbered by the minor sidewalk event.

(4)

Participants in a minor event conducted on the streets or sidewalks shall proceed in an orderly fashion, observe all traffic signals when crossing a street, and otherwise obey the rules of the road, including, where applicable, Code of Ala. 1975, section 32-5A-215.

(5)

Minor events conducted on the streets shall not have more than 25 vehicles at any one time during the conduct of the event.

(6)

For minor events on the sidewalk, such events shall be conducted in a manner that does not substantially inhibit the flow of pedestrian traffic upon the sidewalks.

(7)

Participants in a minor event shall use only the amount of public space reasonably necessary for the conduct of the event so that other minor events that want to hold an event in the same general area can be accommodated. The event administrator may require a reasonable adjustment in event conduct to accommodate multiple uses, including other organized events, of the public space.

(8)

Signage accessory to the event is allowed; provided, however, such signage shall not be affixed to or installed on public property, shall not be within the clear zone, and shall not be constructed or used so as to endanger public safety or interfere with others in their use of public property.

(9)

Minor events shall be conducted in a manner that is consistent with the dedicated or intended use the public space occupied by the event and in a manner which does not interfere with or detract from the use of the public space by other persons or organized events, or pose an unreasonable risk to the public safety.

(c)

If the conduct of an organized event that does not require permitting under this section creates a secondary harm or violates a condition applicable to a minor event, the event administrator shall have the right to require the elimination or modification of the condition creating the harm or the violation, or to otherwise proceed in accordance with section 23-205.

(Ord. No. 13-189, § 1, 5-9-2013)

Sec. 23-233. - Application.

(a)

Application . A person seeking issuance of a special event permit shall file an application during regular business hours with the event administrator on forms provided by the city.

(b)

Application timing .

(1)

Application deadlines . Subject to subsection (b)(4) concerning extended events, in order to facilitate advance planning for a special event, organizers may submit completed or conditional applications for a special event permit starting one year prior to the date of the event. In order to ensure that applications for a special event can be processed prior to the special event, the following event permit application deadlines for completed applications shall apply:

a.

In the case of a minor event that is not required to be permitted but where the event organizer wants to obtain an event permit, the application deadline is no later than ten days before the date of the proposed event.

b.

In the case of basic events, the application deadline is no later than 20 days before the date of the proposed event.

c.

In the case of enhanced events or lease events, the application deadline is no later than 30 days before the date of the proposed event.

(2)

Late applications . Late applications received after the application deadlines noted above shall be accepted and processed by the event administrator prior to the date of the event if reasonably practicable under the circumstances given the proposed conduct of the event.

(3)

Conditional applications . Conditional applications may be submitted in order to meet the application deadline, subject to the obtaining of the required approval, license, permit, or lease at least five business days prior to the start date of the event.

(4)

Extended events . A completed or conditional application for an extended event may be submitted no earlier than 180 days prior to the first day of the event. Where multiple applications have been submitted for an extended event, the applications shall be treated as one application.

(c)

Applications processed in order of receipt . Completed or conditional applications will be processed in order of receipt. An application shall not be considered complete until all required information is provided. Where the event administrator cannot reasonably determine order of receipt, the administrator may conduct a random drawing to determine priority of use.

(d)

Application information . The application for a special event permit shall include information consistent with the purpose of this article and in sufficient detail to allow for its administration, including, where appropriate, the following:

(1)

The name and contact information of the event organizer and the person who will be in charge of the conduct of the event;

(2)

If the special event is proposed to be conducted on behalf of an organization, a letter from that organization shall be required authorizing the event to be conducted on its behalf;

(3)

A detailed description of the event;

(4)

Logistical requirements of and specific plans for the event;

(5)

Information demonstrating compliance with requirements or conditions for permit issuance;

(6)

The expected source of event proceeds, including cash receipts, licensing, sponsorships, television, advertising, and other revenues or concessions, and the expected disbursement of those proceeds;

(7)

A notarized statement that indicates permission has been obtained for the event's use of private property or property under the control or jurisdiction of any board, agency, or other governmental entity;

(8)

A statement of any special circumstances which are material to the permit requested; and

(9)

Such other relevant information as the event administrator may reasonably require in the administration of this article.

(e)

Report . Within four weeks after the conclusion of the event, the event organizer shall provide an itemized report containing receipts and disbursements from the event, which report is subject to verification for accuracy by the city upon written request within 60 days after receipt of the report.

(Ord. No. 13-189, § 1, 5-9-2013)

Sec. 23-234. - Insurance and indemnification.

(a)

Insurance . In the case of enhanced events which are not required to obtain a lease but which the event administrator determines are reasonably likely to pose a risk to persons or property because of the conduct of the event, the event administrator may require the organizer, as a condition to permitting, to provide, at the time of the filing of a permit application, proof of bodily injury and property damage liability insurance written on an occurrence basis and naming the city, its officials, officers, employees, agents, contractors, and volunteers performing authorized city functions, as additional insureds, and covering the entire public area of the event for the duration of the event in a minimum amount of $100,000.00 for the injury to or death of any one individual and $300,000.00 for the injury to or death of any number of individuals in one occurrence, and property damage liability insurance in the amount of $100,000.00. Such policy shall insure both the city and the organizer but shall be so endorsed as to create the same liability on the part of the insurer as though a separate policy had been written for the city and the organizer. Such policy shall be issued by a company authorized to engage in the insurance business in the state and maintaining a Best rating of not less than "A."

(b)

Indemnification . The organizer of a special event shall, at the time of making application for a special event permit and on forms provided by the city, agree to indemnify and hold harmless the city, its officials, officers, employees, agents, contractors, and volunteers performing authorized city functions, from and against any and all claims, costs, losses, expenses through appeal (including reasonable attorneys' fees, and costs or expenses incidental to the investigation of claims and lawsuits), demands, payments, suits, actions, recoveries, penalties, fines, liabilities, and judgments, of any nature and description, resulting from or arising out of the acts or omissions of the event organizer, its officers, servants, agents, contractors, or employees, or event participants, in connection with the conduct of the event.

(Ord. No. 13-189, § 1, 5-9-2013)

Sec. 23-235. - Services criteria, fees, and costs.

(a)

Park fees . An event organizer shall pay at the time of the filing of an application for a special event permit any fees required for the use of any park amenities in accordance with the schedule of fees established by the city's recreation and landscape management department.

(b)

City event services costs .

(1)

City event services criteria . City event services, including the standard complement, will be assigned to or required for an organized event based on pre-established objective criteria related to event conduct that the event administrator determines as being reasonably necessary in order to address secondary harms and accommodate the logistical requirements of and specific plans for the event conduct. Organizers of special events shall work in good faith with the event administrator to try and achieve the least expensive alternative available consistent with the purpose of the proposed special event.

(2)

Exclusion from provisioning of city services. The city shall not provide as a part of the provisioning of city event services for an organized event under this article services for over-night security of an event site, gate security, security for monies or valuables, carting or hauling of waste, and other services which are typically available on a private contractual basis. This subsection (b)(2) shall not be construed to prevent an event organizer from hiring city personnel on an off-duty or extra duty basis to provide such services.

(3)

Provisioning of city event services subject to availability . Notwithstanding anything in this article to the contrary, the provisioning of city event services, including the standard complement, shall be subject to the availability of such services for an event, including unavailability due to prior assignment, public emergency, equipment damage or repair, or scheduled maintenance. Where city event services, including the standard complement, are necessary for the conduct of the event but are unavailable, then the organizer of the special event may elect to modify the conduct of the event to eliminate the need for city event services, cancel the event, provide its own services subject to the approval of the police chief for public safety services, or reschedule the event to a time when city event services are available.

(4)

Reimbursement for city event services . Subject to section 23-231(c)(6):

a.

Standard complement for special events . The city event services standard complement shall, subject to availability and as needed, be provided by the city without charge for special events, except for for-profit events.

b.

City event services in excess of standard complement for enhanced events . Subject to the following subsection c., an organizer of an enhanced event shall be required to reimburse the city for the actual costs for city event services that are incurred by or on behalf of the city that are in excess of the standard complement. Prior to the commencement of the event, the event administrator will provide the organizer with an estimate of such costs; however, the city will not be bound by the estimate should it differ from the actual costs incurred by the city. In no case shall

an event organizer be required to reimburse the city for the costs associated with providing city services based on the actual or anticipated conduct of nonparticipants.

c.

Early application for enhanced events . Except for for-profit events, an organizer of an enhanced event will not be required to reimburse the city for city event services in excess of the standard complement if the organizer has filed a completed or conditional application at least 120 days prior to the date the proposed event is scheduled to commence.

(5)

Where an event organizer desires city events services in excess of those suggested or required by the city based on the criteria set forth above in subsection (b)(1) of this section, the organizer shall be required to either, at the election of the event administrator, pre-pay the estimated costs of such services, which shall be adjusted as necessary once the actual costs have been determined, or reimburse the city for the actual costs of such services.

(c)

Restoration reimbursement costs .

(1)

Notwithstanding anything to the contrary contained in this section, if the event organizer fails to perform the organizer's restoration responsibilities in accordance section 23-203(a)(2), the city may perform or have performed the restoration work and invoice the event organizer for the restoration reimbursement costs. Within ten business days after the date of receipt of an invoice, an event organizer who has been invoiced by the city for the restoration reimbursement costs that disagrees with the reimbursement requirement or its amount may file a written objection with the event administrator stating the basis for the objection.

(2)

The event administrator shall consider the objection and provide a new invoice sustaining the original amount, or modifying or eliminating the charge based on the objection.

(d)

Deposit . At the time of permitting and as a condition to permit issuance the organizer of a special event may be required by the event administrator to post a refundable security deposit of no more than $100.00 for a minor event or basic event and no more than $500.00 for an enhanced event to cover any restoration reimbursement costs that might be incurred by the city. Such deposit, if required, must be required of all organizers of permitted events, or of only those event organizers which, in the past, have failed to perform their restoration responsibilities or have failed to pay restoration reimbursement costs to the city.

(e)

Non-event costs . In no case shall an organizer be required to reimburse the city for the costs associated with providing city services that are assigned by the event administrator based on the anticipated or actual conduct of nonparticipants in the event.

(f)

Invoicing . The city shall provide an itemized invoice for any reimbursements owed to the city under this article, which shall be paid by the responsible person by the date stated in the invoice.

(Ord. No. 13-189, § 1, 5-9-2013)

Sec. 23-236. - Recommendations.

The event administrator may obtain the recommendation of any city department that will be affected by the proposed special event. The event administrator will provide the date by which the recommendation is to be made and any recommendations not received by the due date will be deemed to have been favorable.

(Ord. No. 13-189, § 1, 5-9-2013)

Sec. 23-237. - Processing application; grounds for denial.

(a)

The event administrator shall make a decision on a completed application consistent with this article and as expeditiously as possible given the scope of the conduct of the event. The event administrator shall provide the organizer with notice of his decision and, if the event administrator must deny the application, he shall state in the notice the basis for denial.

(b)

The application for a permit for the special event shall be granted unless one or more of the following conditions are found to exist:

(1)

Application requirements . The application:

a.

Is incomplete in a material respect;

b.

Has been fraudulently completed;

c.

Is for an organized event that is not regulated by this article; or

d.

Is for a special event the proposed conduct of which does not comply with applicable law, including this article or other city laws.

(2)

Prior conduct of organizer or organized event . The application is for an event organizer or organized event that:

a.

Is in violation of the cancellation policies of section 23-231(b)(1);

b.

Has on a prior occasion made a material misrepresentation in an application for a special event that has resulted in a significant secondary harm; or

c.

Has on prior occasions failed to restore the public space or restore or replace damaged public property, or pay to the city the restoration reimbursement costs or other costs or fees due the city under this article.

(3)

Location limitations . The proposed public space, or a portion of the space, cannot reasonably accommodate the proposed event due to:

a.

Insufficient space or capacity;

b.

A prior use of some or all of the same public space or a public space in reasonably close proximity to the space; or

c.

Unavailability because of fire, casualty, acts of nature, or public emergency.

(4)

Non-curable secondary harms . The proposed conduct of the event would have secondary harms that cannot reasonably be cured, including unreasonable hardship to adjacent or nearby uses due to repeated or prolonged street closure; unreasonable interference with the use of the public space by other persons or organized events; or unreasonable demands on the city's resources because of unusual, extraordinary, or burdensome costs or expenses.

(5)

Use of parks . The likely detrimental impact of the proposed event on the use and physical integrity of the park and its facilities or amenities taking into account such factors as:

a.

The ability of the park to accommodate the conduct of the event;

b.

The physical condition of the park;

c.

The existence of reasonably available alternatives;

d.

Conflicting uses of the park;

e.

Secondary harms; or

f.

The number of prior uses already scheduled for the park and the ability of the park to accommodate repeated uses without suffering material damage.

(6)

Public safety . The proposed conduct of the event will be likely to have an impermissible impact upon public safety because it will:

a.

Substantially interrupt the safe and orderly movement of traffic in the area of its route or location and there are insufficient public safety services available at the time to mitigate the disruption;

b.

Require the diversion of so great a number of police officers of the city to properly police the area or route that will be occupied by the special event and contiguous areas so as to prevent normal police protection to the city;

c.

Require the diversion of so great a number of ambulances and fire rescue units as to prevent normal ambulance and rescue service to portions of the city other than those areas or routes that will be occupied by the special event and contiguous areas;

d.

Involve the concentration of persons, animals, floats, or vehicles at the assembly points of the event that will unduly interfere with proper fire and police protection of or ambulance service to areas contiguous to such assembly areas;

e.

Interfere with the movement of firefighting equipment en route to a fire;

f.

Fail to provide proper sanitation services; or

g.

Otherwise pose an unreasonable risk to the public safety.

(7)

Major arterials . The location requested is for a street that is a major arterial within the city limits, unless the magnitude of the event requires it and such an event cannot reasonably be accommodated elsewhere. This subsection (7) shall not apply to processions that merely cross a major arterial and that are not otherwise prohibited according to the terms of this article.

(c)

Alternative to denial . Should the event administrator have to deny a permit pursuant to this section and there are reasonable alternatives to the conduct of the event that are available and that would eliminate the basis for denial, the administrator shall propose the alternatives to the organizer who must accept those alternatives by providing a notice of its acceptance by the next business day following the organizer's receipt of the administrator's decision notice, otherwise the denial shall stand.

(d)

Conditional approval .

(1)

In the case of completed or conditional applications that have been filed more than 30 days in advance of the event, the event administrator may issue conditional approval for the event if the event is due to be approved except for one or more of the following pending items:

a.

Action being taken with regard to required approval, licensing, or permitting pursuant to other city laws or laws administered by the health department, or except for required leasing of the public space;

b.

Confirmation of the availability of city event services; or

c.

Confirmation that the public area requested for the event has not been scheduled for a state or city public building or works project, including improvement or infrastructure maintenance, repair, or construction.

(2)

Issuance of a conditional approval shall mean that, except for the pending items, there are no conditions that are known to exist that would constitute a ground for denying the permit. Nothing in this subsection (d) shall prevent the revocation of a permit in accordance with section 23-205.

(Ord. No. 13-189, § 1, 5-9-2013)

Sec. 23-238. - Appeal of denial.

(a)

Right of appeal . An organizer denied a special event permit may ask for a review of the decision by filing a written notice of appeal, stating the reason the denial should be overturned, with the event administrator within five business days following receipt of the event administrator's decision notice denying the permit. The appeal shall be heard and decided by the mayor's designee who shall schedule a hearing on the request within five business days following receipt of the notice of appeal. Should the time scheduled for the hearing cause a delay of the proposed event, an alternate date will be made available upon request and, should the public area requested be available and uncommitted, it will be reserved for the event, pending the outcome of the appeal. The organizer shall be given at least 24 hours' advanced notice of the hearing.

(b)

Conduct of hearing . The organizer, or someone designated by the organizer to act on the organizer's behalf, shall appear at the hearing in person, and may be represented by counsel. Failure of the organizer, or the organizer's designee, to appear at the hearing shall be deemed to be a withdrawal of the appeal. The event administrator shall attend the hearing. The event administrator and the organizer, or the organizer's designee, shall have the right to be heard on the matter and present evidence in support of their respective positions. The mayor's designee shall uphold the decision of the event administrator if a ground for denial exists and, where appropriate, offer an alternative to denial in accordance with section 23-237(c). The decision may be made at the conclusion of the hearing stating orally the reasons for the decision, or, by written notice by the close of the next business day following the close of the hearing and shall state the reasons for the decision. Failure of the mayor's designee to render a decision by the close of the next business day following the close of the hearing shall operate as an automatic upholding the event administrator's decision.

(c)

When review not available . In no event will a review lie under the provisions of this section for the denial of any permitting or licensing that is not issued under the authority of this article,

including alcoholic beverage licensing, business licensing, technical and fire code permitting, and fireworks permitting.

(Ord. No. 13-189, § 1, 5-9-2013)

Sec. 23-239. - Permit amendment.

(a)

A special event organizer who wishes to materially modify the conduct of the event as authorized by the special event permit shall file a permit amendment application with the event administrator on a form provided by the city within the applicable time prescribed in section 23-233(b). The permit amendment application shall describe the proposed change in the conduct of the event with the same detail required by section 23-233(d) for the initial permit application and shall otherwise comply with the provisions of this article. The event administrator shall take action on the special event permit amendment application in accordance with the terms of this article. The notice of decision and hearing provisions set forth in this article also shall apply to applications for permit amendments.

(b)

A non-material change to the event conduct of permitted special event that complies with this article may be made at any time prior to the start of the event by notifying the event administrator of the proposed change.

(Ord. No. 13-189, § 1, 5-9-2013)

Sec. 23-240. - Contents.

Each permit issued under this article shall specify the restrictions, conditions, or limitations on event conduct as the event administrator may deem necessary for the administration of this article.

(Ord. No. 13-189, § 1, 5-9-2013)

## CERTIFICATE OF SERVICE

I, Matthew Clark, hereby certify that on May 29, 2019, I served a copy of the foregoing to the following via first class mail and email:

David J. Canupp
J. Bradley Emmons
LANIER FORD SHAVER & PAYNE, P.C.
P. O. Box 2087
2101 West Clinton Avenue, Suite 102 (35805)
Huntsville, AL 35804
Phone: 256-535-1100 / Fax: 256-533-9322
E-mail: djc@LanierFord.com & jbe@LanierFord.com

*Attorneys for Defendant City of Huntsville*

I also certify that I served a hard copy and a request for waiver of summons upon the following newly-added defendant via first-class mail:

Mark McMurray
Chief of Police
City of Huntsville Police Department
815 Wheeler Avenue
Huntsville, AL 35801
Phone: 256-427-7001

*/s/ Matthew J. Clark*
Matthew J. Clark
*One of the Attorneys for Plaintiffs*
*James and Carol Henderson*
P.O. Box 179
Montgomery, AL 36101
Tel: 256-510-1828
mclark@clarklawgroup.org
